Case number 20-3081 United States of America v. Amistad Jumon Veney appellant, Ms. Wright for the appellant, Mr. Hemsworth for the appellant. Good morning. Good morning. May it please the Court, Lisa Wright representing Mr. Amistad Veney. I'd like to reserve two minutes for rebuttal. The District Court here committed legal error in concluding that Mr. Veney's continuation of his forward motion was per se inconsistent with submission. Is that microphone on? Is it on? Microphone? There's a green light. Yeah. Can you hear me? Okay. Must be me. No, I was having trouble too. Maybe pull it a little closer to you. Is that better? Yes. Yes. Okay. Because the District Court mistakenly concluded that Mr. Veney could not submit while he continued to walk, the District Court did not address at all or even mention Mr. Veney's argument that he submitted by immediately turning around as Torres had requested. Here we have the body-worn camera video from which the Court can see that Mr. Veney did indeed submit. Because the facts are fully available to this Court via the VWC, the Court can and should conclude that there was a submission and suppress the evidence that was the fruit thereof. In the alternative, if this Court agrees that the District Court committed legal error in finding that Mr. Veney's forward motion was determinative, but was inclined to have the District Court address the significance of Mr. Veney's turn in the first instance, a remand for that purpose would also be appropriate. Can you clarify what your test is for submission? Does Mr. Veney have to both stop and turn around in order for there to be submission? No, no, no, because one would be enough. Well, the request was listed. We would say the request was to turn around. It was a rejection of Mr. Veney's rejection. Of the request to turn around. And you think that he fully turned around and faced the officer? I think that he gave the officer the view that the officer was requesting. He wanted to see his front and he could see his front because of the way the angle was he was able to see. In fact, I mean, the side view was really the. So I've watched that body cam, you know, at 15 seconds over and over. And I guess. What's it? What if I did? What if I do not disagree with any of the district court's actual determinations? Is it is it possible for you to still win this appeal? I believe so, because the court didn't even address the turn. That was our argument below that he had to submitted by turning. And the district court does not even mention that argument in the opinion because the court thought did not matter since he was moving. And we understand that the video is very fast. Everything happens in two seconds. And in fact, he really submits in the first second, because if you look. And he says, no, the counter is at thirty three. And then he takes a step. He takes a left step and turns his head. That's page 19. I believe takes the right step and turns his body. Twenty and then on twenty one is when he hesitates and the counter there is still thirty four. So we understand it's fast, but there is a way and I don't know if others are more tech savvy than I am, but you can put playback into super slow mode and that does help. But we believe our screenshots to show the submission. You think he stopped walking away? I think he he was he continued to move. But at worst for us, what the district court said was that he would not feel free to leave until he showed that he did not have a gun. So that's not saying there was no halt. There was no hold on or stop order. So what we would say is he couldn't leave without turning around. And he did do that. He did turn around and he wasn't walking away because he was already walking. And the government acknowledges that he was within his rights to have walked away. That's when he walked away with initially. After that, he's simply continuing to do what he's doing. Only he's turning around to show his front. And I think it's really on all fours with the Gibson case where the command was, let me see your waistband. In that case, police had pulled up beside someone who was walking and that person continued walking while their shirt was lifted. And the court, the district court found that that was a submission. And here we would say it's even a stronger case because in Gibson, they were maintaining the same distance from each other. And here Mr. Vini actually hesitates before taking that third step such that they're getting closer and he's allowing for us to draw closer to him. He covered like a half a tree box distance while Torres covered the whole tree box. I mean, he was letting him come to him in a way that Gibson wasn't. So the dialogue that precedes all of this is. Big man, you got nothing on you, man. In vain, he responds, I don't got S on me. And then he says, you might you mind turning around for me? And he says, I'm not man, I'm going to walk off. That's what the district court. Yes. And then for us, presses the matter by saying, no, I just want to make sure you got no gun. The district court makes a finding at the bottom of page 80 or a 34. Hearing over to the next page that as far as the seizure goes. The district court makes a finding that Vaney has satisfied his burden of producing evidence. Showing that a reasonable person in his shoes would not have felt free to leave. Until he proved to the officer that he did not possess a gun. You don't challenge that ruling. They said, yeah, that's a factual finding. I mean, we, we actually. Actually, we are our main argument. We believe we prevail under that interpretation of exchange. But we actually think that it's simpler than that. And it's just he wants him to turn around. He refuses and he says no. And that it really is just a rejection of Mr. Vaney's rejection. And he's saying, no, turn around. I asked you to turn around. You declined. I'm saying no. So, but even under this. Interpretation of that passage, we would still. So, so if the ruling is that he a reasonable person would not have felt free to leave. Until he proved to the officer that he did not possess a gun. Then the district court. Followed from that. Then that he was seized. And he was not free to leave. And because he continued walking, he did not submit. So, if, if the ruling is correct, that a reasonable person would feel that they were not free to leave. But he left. Tried to leave by walking. How was that an erroneous rule? Oh, a couple of things. He isn't actually leaving officer Torres because officer Torres has followed him. He left for us. That's that's 1 thing, but. I would say that. I guess to the extent for the 4th amendment, you have to be successful in leaving. You have to get away. I mean, if you. Even if you don't successfully leave. I mean, we wouldn't have cases. If if the people who fled were successful, right? Right. There's no flight. I mean, this is not a flight situation, but I understand what you're saying. But. If you start walking. That is different than continuing to walk. That is our point. And I think Brendan Supreme Court said what what you're doing beforehand is significant to whether. There's been a submission and here all he does is continue. And in fact, he doesn't exactly continue. He slows down. He hesitates. And I guess this is we'd have to find clear error to find that. Right. Because the district court finds that he walked at the same pace. I guess I think that that is probably correct that there is there on the body 1 camera because you can count the steps and you can see and see him hesitate on. Age. It's 20, I think I actually have a typo in the brief where he's hesitating most clearly at the top of page 2120. But, yeah, I do think when the district court said he walked at the same pace, that's not accurate. And partly it was because, you know, the judge really didn't care what case it was, I think, because he just thought he was moving and he was leaving. But as far as what him saying, you have to prove to the officer he didn't possess a gun. I want to be clear. You know, there's we are not certainly thinking that that would mean or agree that that would mean that he had to strip down or in some way, literally prove he didn't have a gun. But it's, you know, until he shows the government that what the cop is asking to see, because the cop is interested in the gun. And I think and whether he has a gun and I think he says, you know, like we say in the reply, you know, when he's basically saying, would you mind doing X for me? And Mr. Vini says, no, I'm not going to do X. I'm going to do Y. And the officer says, no, I just want to make sure, you know, Z, make sure you don't have a gun. And so the no is really saying, give me what I want, which is to see that you don't have a gun. And the turning around satisfies that. And indeed, that's exactly what the officer had asked for originally and been refused. I mean, that is the request that and he's already legitimately walking. There is a difference between starting to walk. When and not when you think you can't leave without showing that this is all happening simultaneous, he's already walking just as in Gibson. It really is. And the government doesn't dispute that Gibson is correctly decided. They try to distinguish Gibson. I'm not really clear on the distinction they're making, but they seem to be saying that somehow Mr. Gibson is keeping up with the police car when really just as here, the police car is keeping up. And in fact, our case gaining on defendants, I mean, it's clear that Torres is walking faster and then the appellant because. He's several feet away from the appellant when the appellant starts walking. So. So. Not sure. Where that gets you where the district court finds that. They are essentially parallel when Torres observes. What he believes to be an imprint of a weapon in the district court makes that fine. Right. Well, we believe we do dispute the court's summary of the body worn camera footage because the court skips over entirely the turn, which was our whole argument below. Says he summarizes it as officer Torres while walking a few feet behind me. Well, no, I just want to make sure you got no guns and then skips and says the next thing, Vini, as he walked at the same pace down the street with officer Torres walking parallel beside him. Don't ask on me. What are you talking about? We do we don't not accept those that actual description of the body worn camera, and I understand it's quick, but that's simply not what happened. And, you know, I just think it's telling that the district court doesn't. Doesn't even take on the term. So, I mean, if this court, you know, were to remand to the district court to take it on, that would be one thing, but I don't see how. We can lose on the facts here when the district court didn't even really address the fact we're focusing on just kind of skipped over. You can't go from being a few feet behind to walking at the same pace. Parallel mean, in fact, something happened, which was that he caught up with him. And part of the reason he caught up was that hesitation on that third step. I mean, they're keeping pace with each other. Are you saying that the district court found that the two men Torres, officer Torres and Bainey were walking at the same pace? Oh, no, I guess. Well, no, he's saying that being continued to walk at the same pace. With officer Torres walking parallel beside him, but again, the court gets in there. From walking a few feet behind and doesn't dress like. How it was, it was because Mr. Bainey turned and hesitated. They were keeping the same pace initially, although the steps were bigger. They were taking the same number of steps when he said, no, head turn. No, I got that back. No, head turn. Body turn. At that point, it's been Mr. Bainey hesitates and course takes that. And then together they take the opposite. And by that time, but truly in that first second is when the turning and the hesitation took place. And the court just didn't consider that low because it didn't think it mattered. Your argument rests on revolves around the proposition that he was stopped earlier than the district court found that he was. But why wouldn't it still be justified as a Terry stop? Because it's a high crime area known for firearms. He was walking away, making furtive gestures, trying to conceal something in his waist band. And why isn't that enough to stop him anyway? And then once having stopped him and noticing the bulge, which turned out to be a firearm. Well, the government has you didn't dispute that part of the district court's findings, did you? Well, we dispute the we dispute the district court's characterization of for his testimony with respect to the hand positioning position. And yeah, but what I'm I'm not talking about that. I'm talking about the observation that he was making gestures to try to conceal something in his waist. Yeah, but that's not what was said, what we're saying. So we don't agree with that. First of all, district judges don't even have to write an opinion in this kind of a case. They can just say denied. The district court did not find that there was reasonable suspicion at that point. The district court said the linchpin of its reasonable suspicion finding was the seeing of the bulge. Yeah, well, we're not there. This is the Nova review. Well, the government isn't asking this court to find reasonable suspicion. The government's asking for a remand for the district court to consider that because it was never considered. We would say the district court implicitly rejected that because did not even mention that potential thing that it was holding. Well, that doesn't mean the court rejected it because he didn't mention what he had. Well, you didn't need to mention. That's correct. All right. Can I get I can't carry on something your client said on the body cam. Your theory today and in your brief is that we know he submitted because he turned around enough for the officer to see the bulge. Right. Yes. Yes. So far. Not a yes. But is that a yes? Yes. Okay. But I think on the body cam video. Your client says something like, you didn't see nothing, man. I walked off. So how is that consistent with your theory? Are you referring to when he says, no, I'm going to walk off. No, it's later. I think the officer says, I saw the outline, bro. This is not a direct quote. Right. And then Mr. Vini responds with something like, you didn't see nothing, man. I done walked off. Not sure exactly what point you were saying that was in response to Taurus saying what I saw the outline. I think that's much later when he's when they're arguing at by that point. Right. But that that's that's my point. I think is that if it's much later and Mr. Vini is saying, you couldn't have seen the outline of the gun. Right. He's saying you, you can't see it right now as you're looking. He's pointing at one point and he's saying, well, what is this? And he's like, this is about he is disputing. You know what the office is saying, just tell me, see, or explain why there's not tension between your theory that Mr. Vini turned around enough to show the officer the bulge. Right. Gun was contrasted with Mr. V's later statement. You, the officer couldn't have seen anything. I was walking off. Listen to the I would want to listen to that tape again, because I don't really remember the wording being like what you're saying. I thought it was. He was, if anything, he was saying as the words, you know, pointing at him in his waist, he's saying, what are you talking about? This is a belt. He's acknowledging that the officer and see a bulge. He's trying to persuade him that he's that it's not contraband. That's different than acting like he thinks that couldn't be seen. I mean, I'm not saying Mr. Vini might have been hoping he didn't see it, but he did reveal what he asked for. I mean, it's kind of notable that in a couple of the cases where evidence has been suppressed or compliance with a command like. Both may be, for example, and in Brody, the compliance doesn't actually yield fruit. The person runs off and then the fruit is revealed here. You know, he actually gave him exactly what he wanted. It yielded exactly what he wanted. And I guess we would say that is very clear submission. Thank you. We'll give you a couple of minutes. But. Mr. Hansford. Good morning, Your Honors, and may it please the court. Eric answered the United States. The defendant's claim that he submitted in this case fails for two separate and independent. First is, as the district court found a show of authority meant that the defendant was not free to leave. And yet the defendant was continually trying to walk away throughout the encounter. And the district court specifically finds that he was trying to walk away and footnote for the opinion. Second, even assuming that the defendant would have complied by turning around as he was leaving. The video makes clear that he did not ever turn around. And instead, as the district court found, the officer spotted the gun from the side as he was overtaking the defendant. But for both those reasons, the argument does not. I suppose we don't agree with the first proposition. And we agree that he could have submitted by turning around. But there's no finding by the district court as to exactly whether he did turn around or whether it was sufficient to be a submission. Why shouldn't we remand instead of making that factual finding ourselves in the first instance, which we don't do as a court of appeals? So I think you do have a factual finding, an important factual finding from the district court on age 65 of the FSOB. I think it's 36 of the appendix where the district court is saying the officer saw the gun from the side. And contrasting that with the post arrest photos or the arrest photos that are taken from the front. Explaining that it makes sense that the officer would have been able to see the gun from the side, even if he couldn't make it out the front. And so I think that's perhaps not the most explicit finding. But I think that is a finding that the officer is seeing it from the side. And therefore, that's inconsistent. How is that inconsistent with the turning theory? I mean, if you see something from the side. That is in the front of the other person, you either have to be in front of that person slightly or that person has to turn slightly to you to see them. Well, I think when you take it in conjunction with the body worn camera, which shows the officer walking past the defendant looking over to his right as he's doing so. I think the finding that it's made from the side does mean that the officer is spotting it, not as the defendant is turning. Because then the finding, I think, would be that he's seeing the gun from the front. So we have to infer that that's what the district court found, since we don't have an explicit statement to that effect. I think you don't have a completely explicit finding on that, but I think that's the reasonable inference from what the district court is saying. I think you can also look at the body worn camera here and say that no district court is going to be able to find that the defendant did turn based on this body camera where there's no indication in the transcript. There's no testimony or other evidence that he did turn. There's just nothing to suggest that he did turn. You don't think I can look at the body worn camera and see that there's at least a slight turn? I don't think so. I don't I don't think there's a slight turn in the body worn camera. I think if you especially the full scope of the all three body worn cameras, I think from certain angles, it might seem like he was starting to turn. But then I think when you're looking at Jacobs Macaw camera, it's clear what he's doing. But I do think I think the first point is the reason there's more explicit findings on the first point that the defendant was not free to leave is because that was the primary rationale for opinion. And we do think that rationale. It's fully supported by what the district court saying what the I guess I'm having trouble understanding the defense argument. And as I understood to the court's questions to judge Wilkins questions, the defense is accepting the finding that there was a show of authority that required the defendant not to leave until he proved that he didn't have a gun. And so I don't think that is. I think that that show of authority finding is going to control the fact that the defendant was continually walking away. So let's let's do a little demonstrative. Sure. Let's suppose I'm the defendant. You're the officer. I do like this. See? Well, I don't stop moving. I submitted. No, not on the district court's fact. They couldn't detect any bulges with a robo in any. So I think you can see that for a couple of both actually. So that the factual bucket is the full context of what the what the conversation happened. So the officer approaches as you have anything on. And it says no. The officer says, would you mind turning around? That's not the show. Defendant says, no, I'm going to walk off. The officer then says, no, I just need to make sure you don't got no guns on. That's the show. And the way that he wanted him to do that was turning around. I don't think I don't think a reasonable person would understand that merely turning around as you're walking away in that whole context going to satisfy the officer. Instead, I think what you have here is a reasonable inference. The officer with the district court's finding the officers trying to determine if the defendant hasn't done part of that, maybe turning around. But it's not for the defendant to decide on his own that all he needs to do is turn around. And then that's kind of sad. But that's all he was told to do is turn around. I mean, no, I think he's I think what he's being asked to do and what the show of authority is, is to stop. He said, no, I just need to make sure you don't have no guns. That comes directly after the defendant says, I'm going to walk off. And then he starts walking off. The no, I think, is most easily understood as responding to that. And that's supported by the larger context. But the defendant's no is most easily or reasonably responding to the request that I want you to turn around. That may be right, but I don't think the defendant's no is what's controlling the show of authority here. It's the officer's words in the show of authority. And I think you're seeing you also see this in the case, both in the more general sense that how this court commonly and the Supreme Court commonly defines what a show of authority is, what a seizure is, is a situation where the person's not free to leave. So we go through some of that case law in 21 to 22, even just the language of it's a Terry stop. It's a detention. That is indicating that you are not free to leave. But then you also have the more specific cases. Brody's the cleanest example where the officer is pulls up beside the defendant, says, put your hands on that car. The defendant does so for a few seconds. And then the officer turns away and the defendant runs off. What this court says is that when he puts his hands on the car and remains there for a few seconds, that's brief submission. But that when he runs away, that's no longer submission. So, in other words, implicitly, what this court is saying in Brody is consistent with Mabry is that it's not just that he had to literally comply with man by putting his hands on the car. And then he can he's free to leave. It's that he has to put his hands on the car and remain there until the officer indicates that he's putting your order to put your hands on the car as a different purpose in an order to turn around. Officer didn't in in Brody didn't order him to put his hands on the car just so that he could see his hands and observe his hands. It was so that he would be there in a position so that he would be seized and could be frisked. We don't know exactly why. Why else would an officer lawfully? What other lawful basis would an officer have to tell somebody to put their hands on the car other than your hands on the car? Because I intend to frisk. I mean, I think it I think Brody, what you have is a situation where a defendant leaving the scene of a warrant. So it may just be that they're ultimately identifying him. It may be that they're frisking, but I would say that's the same as this case, which is that it does the officer no good. If the defendant, as he's walking away, turns around, revealing a gun that would confirm the officer's suspicion. And you understand at that point that the defendant is nonetheless still free to walk away. What what is understood? It seems like you're blurring the analysis here with that statement. I mean, if they had turned around as soon as the officer asked him to. And said, look, OK, and then started walking away. He would have complied with the office, right? Unless and until the officer told him to stop. So there is no show of authority at the time that he's he's asked to turn around and it's a request. It's not a command to turn around. But and so, I mean, I think at that point, yes, he's fully free to leave because there has not been a show of force. But once there's a show of authority, isn't there a presumption, maybe a rebuttable presumption, that a presumption that the suspect is not free? Right. I mean, I think that's generally what a show of authority means. Exactly. And I think that is what this court is saying in the Mabry case, in the Delaney case, in defining a show of authority as a situation where the defendant's not free to leave. And I think this goes to Rendlin more generally talks about how there are public safety concerns. Anytime there are these sorts of interactions and what you want to address those public safety concerns. He says to this as well, put the officer unquestionably in charge of the situation for the officer to be the one who is indicating when the seizure is terminated. And that's what a reasonable person would understand in that context. So if there is no legal basis for it, then the remedy there is to go to court, ask whether or not there's reasonable suspicion, as opposed to the defendant deciding on his own to narrow the officer's request, turn away and walk away. That's when you run into public safety problems that are indicated in Rendlin. And just lastly, on Randolph's questions about reasonable articulable suspicion in this case, we do agree that given the district court's finding of the movements plus the high crime area, which support a finding of reasonable articulable suspicion, we do understand there are kind of challenges to the factual findings related to the district court's opinion on that score. And the district court didn't resolve the hand-to-hand transaction findings. So that's why we are asking for a remand there. Straight affirmance on the reasonable articulable suspicion. But that that would be our position on that. There are no further questions. All right. Thank you. That's right. We'll give you two minutes for rebuttal. Thank you. The government says that the court found that he that Officer Torres saw the bulge from the side and went parallel and that that dooms our argument. But this is not at all inconsistent with him turning because the officer is. What should the officer have done according to your view? Is walking besides the defendant and the defendant does not turn around and insists on walking. What should the officer have done then? Well. It's our position that he shouldn't have told him to stop at all because there was no. Let's take it from where the video takes. The officers walking beside him tells the defendant to stop or no. And the defendant keeps walking. What should the officer have done? Well. He could have said stop at that point. But the officer can do whatever the officer wants. But the question is, you know, we've been debating this now for 20 minutes. How long did this encounter take? He stopped within one second. In one second. Excuse me. Even if he was the most brilliant expert in the Fourth Amendment. Do you think he went through all the calculations and machinations that we're going through in 20 minutes of oral argument by competent counsel? The question is, there was nothing for the officer. No decision to be made by the officer. Under Hodari, the officer makes a show of authority. And then it's the defendant's actions. Nothing the officer could have done or not done would have changed whether Mr. Vini submitted. So there is no split-second decision-making by the officer. The split-second decision-making was when he chose to issue a show of authority, which we would say was a mistake. And we understand those calls are difficult for officers. But what we're talking about is afterwards in this sort of, at this point, it's just an objective question of whether his actions were a submission. And, you know, the government says that no turn can be seen on a body-worn camera. And we would just say that the screenshots on our brief clearly show there was. And that in the context merely turning around isn't enough, but that's all he was asked to do. And then, finally, the government is saying that a Terry stop is, you know, it's all about being free to leave. And what our point is, is this is an acquisition by control, in the words of Torres v. Madrid. And here Torres controlled the movements of Mr. Vini. And the other language from Mendenhall besides being not free to leave is giving someone direction and suggesting that compliance might be compelled. And so if you comply with what they're trying to compel, that also is a seizure. And we also point to the language in Terry that says, was the defendant's liberty restrained, quote, in some way. And here, this one would finally say that, you know, by moving his body in the way Torres was demanding and engaging with him, despite his expressed desire not to engage with him, because beforehand he's looking dead ahead. I mean, that photograph you can just see, studiously walking. And he changes his behavior, gauges and turns in response. And in that way, he is allowing Torres to control him, his movements, and he was thereby seized. Thank you, counsel. We'll take the matter under advisement.
judges: Wilkins, Walker, Randolph